UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JACOBS SILVER K FARMS, INC., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>TAYLOR PRODUCE, LLC, et al.,<br><br>Defendants. | Case No.  4:13-CV-535-BLW<br><br>Consolidated Cases:<br>4:14-CV-141-BLW<br>4:14-CV-247-BLW<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

## INTRODUCTION

The Court held a three-day bench trial in this case concluding on November 9, 2016.  Thereafter, the parties submitted proposed Findings of Fact and Conclusions of Law that were received on November 21, 2016.  The case is now at issue.  For the reasons explained below, the Court finds that plaintiffs are entitled to a judgment in the sum of $1,327,478.16 against Idaho Potato Packers Corporation, Nonpareil Corporation, Nonpareil Farms, Inc., Nonpareil Processing Corporation, and Nonpareil Dehydrated Potatoes, Inc., jointly and severally

**FINDINGS OF FACT**

Plaintiff Jacobs[1] shipped $1.5 million worth of potatoes to Taylor Produce in 2013, but was paid only a fraction of that sum.  Jacobs brought this lawsuit to recover the unpaid balance of over $1.3 million.

Jacobs grows potatoes while Taylor Produce packages, sells and ships potatoes to end-users.  The relationship between Jacobs and Taylor Produce began in 2013 when Jacobs consigned fresh potatoes to Taylor Produce for sale.  Their agreement was not a pure consignment, however, because Alan Taylor, Manager of Taylor Produce, promised Jacobs a price range that would vary but was most often between $6.50 and $8.00 a hundredweight.  All of Taylor Produce's expenses – from marketing to packaging – were factored into the price, except for taxes.  This meant that Taylor Produce would remit all the sales proceeds to Jacobs except for the taxes.

As those potatoes were sold, Taylor Produce sent accountings to Jacobs verifying that they would receive payment for the sale of their potatoes as follows:

    a. Silver K Farms was owed $611,408.44;
    b. Kirk Jacobs Farms was owed $719,640.20; and
    c. Reynolds Bros. was owed $208,028.71.

*See, Defendants' Exhibit 5008.*  Those figures add up to $1,539,077.35.  Taylor Produce made some payments but the amount still due and owing is $1,327,478.16.

---

[1] The Court will refer to the plaintiffs – Silver K Farms, Kirk Jacobs Farms, and Reynolds Bros – as "Jacobs."

Taylor Produce did not sell the potatoes itself but entered into a Marketing Agreement with Idaho Potato Packers Corporation (IPPC) whereby IPPC would market and sell the potatoes, remitting the sales proceeds to Taylor Produce, who would then package the potatoes and ship them to the customer.  The Marketing Agreement stated that IPPC could charge Taylor Produce for marketing fees and for commissions for sales under the Betty Crocker label, but the Agreement did not specify whether IPPC could deduct those expenses before remitting the proceeds to Taylor Produce or whether IPPC should remit all the sales proceeds and bill Taylor Produce for those expenses.

Prior to entering into the Marketing Agreement, IPPC invested $5 million in Taylor Produce, taking a 49% interest in the company.  The point of the Marketing Agreement was to put in writing Taylor Produce's promise to use IPPC as the exclusive marketing agent for Taylor Produce's potatoes and to specify the expenses IPPC could charge to Taylor Produce.

The arrangement between Taylor Produce and IPPC was strictly between those two parties, and Jacobs was not a party to their Marketing Agreement.  In like fashion, the arrangement between Taylor Produce and Jacobs was strictly between those two parties, and IPPC was not a party to their agreement.

Each of the parties did know of the other's involvement.  For example, Jacobs knew that IPPC was marketing and selling potatoes for Taylor Produce.  However, no evidence was presented that Jacobs had agreed with Taylor Produce to pay IPPC's expenses such as those for marketing, freight, packaging materials, or commissions.

There was no evidence that Jacobs or Taylor Produce contemplated that the sales proceeds due to Jacobs would be reduced by anything other than taxes.

Between January 1, 2012, and December 31, 2013, IPPC marketed and sold Taylor Produce's fresh potatoes that were supplied by multiple farmers.  IPPC provided packaging materials to Taylor Produce, but did not perform any packing services in connection with its sales of the potatoes.  All the potatoes consigned by Jacobs were packed by Taylor Produce and shipped directly to IPPC's customers.

Following the sales of Taylor Produce's potatoes, IPPC collected the gross proceeds from its customers and deposited them into its operating account, which included both PACA trust and non-trust assets.  Between January 1, 2012, and April 2013, IPPC deducted, before remitting the sales proceeds to Taylor Produce, the following expenses: (1) freight, (2) Outside Brokerage Fees and (3) commissions for sales under the Betty Crocker label.

In April, 2013, Alan Taylor complained to IPPC that he was having cash flow problems, could not pay his growers, and needed IPPC to remit the entire sum of sale proceeds without taking out deductions.  Christopher Abend of IPPC disputes a portion of Alan Taylor's account.  Abend testified that Alan Taylor only expressed a concern over cash flow in requesting that no deductions be taken, and never revealed that he was unable to pay growers.  Abend testified that he did not learn that Taylor Produce was unable to pay growers until November of 2013.

Concerning the conflict in the testimony between Alan Taylor and Christopher Abend, the Court finds Alan Taylor most credible.  But even if Abend's version is

accepted, Alan Taylor's complaint put IPPC on inquiry notice in April of 2013 that Taylor Produce might be unable to pay growers.  What inquiry did IPPC undertake?

Abend testified that he did examine Taylor Produce's K-1 tax form that showed the company had $1.4 million in assets, misleading him into believing that Taylor Produce would have more than enough to pay growers.  But IPPC went no further. IPPC's Chief Financial Officer Jace Katseaneses testified that IPPC had no access to Taylor Produce's financial records in 2012 or 2013.  So, IPPC did not know how much money Taylor Produce had on hand or what it owed at any time in 2013, did not examine their accounts receivable, and did not even estimate any financial figures for Taylor Produce from IPPC's own records.

Nobody from IPPC explained why they – having invested $5 million in Taylor Produce and taken a 49% ownership share – were unable to access Taylor Produce's financial records.  There was no testimony from anyone at IPPC that Taylor Produce rejected or ignored IPPC's requests for financial information.  From this record, it appears that IPPC simply trusted Alan Taylor based on their long-standing relationship, and did little to inquire further.

At any rate, in April of 2013, IPPC ceased taking any deductions to accommodate Alan Taylor's request.  But five months later – in September of 2013 – IPPC began taking deductions again, and for the first time started taking additional deductions for its marketing expenses and for the cost of the packaging materials it provided to Taylor Produce.

During the entire period from January 1, 2012, through December 31, 2013, IPPC deducted the following sums from the gross sales proceeds before remitting any sales proceeds to Taylor Produce:

    a. Marketing fees in the amount of $158,441.06;
    b. Commissions in the amount of $230,035.21 for sales under the Betty Crocker label;
    c. Packaging materials in the amount of $1,001,313.61;
    d. Outside Brokerage Fees in the amount of $211,724.23; and
    e. Freight charges.

IPPC offered no documentary proof in the form of invoices or other billing statements to substantiate that the freight, packaging materials and Outside Brokerage Fees were actually incurred for the benefit of Taylor Produce.  IPPC offered no documentary proof in the form of cancelled checks or other confirmation that the freight, packaging materials and Outside Brokerage Fees were actually paid.  The Chief Financial Officer of IPPC, Jace Michael Katseaneses, admitted that IPPC's records did not reveal which, if any, of the sums IPPC deducted from the proceeds it remitted to Taylor Produce were related to the sales of Jacobs' potatoes.

**Facts Concerning Alter Ego Claims**

Jacobs claims that five defendant corporate entities are alter egos of each other. The five defendants are IPPC, Nonpareil Corporation, Nonpareil Farms, Inc., Nonpareil Processing Corporation, and Nonpareil Dehydrated Potatoes, Inc. (collectively referred to as the "Nonpareil Defendants").  Each is an Idaho corporation.  All of them share (1) the same corporate address of 40 N 400 W, Blackfoot,

Idaho; (2) the same corporate President, Christopher T. Abend; (3) the same corporate Controller and CFO, Katseaneses; and (4) the same corporate Secretary, Eileen Abend, who is deceased.

CFO Katseaneses performs the same duties for each of the Nonpareil Defendants and reports directly to Abend for each of the companies.  Katseanes testified that as the Controller and CFO of the Nonpareil Defendants, he oversees a single department that handles accounts receivable for all the individual companies.  He also testified that Nonpareil Corporation is the "parent" of all the other Nonpareil Defendants, including IPPC, and has no other business purpose.  The Nonpareil Defendants file one consolidated federal tax return, which is signed by Christopher Abend.

## Facts Concerning Segregated Funds

In January of 2014, IPPC deposited $114,798.92 into a segregated account at Zions Bank, which it admits is owed and belongs to the valid PACA trust beneficiaries of Taylor Produce.  *See*, Exhibit 5005.  Katseanes testified that IPPC is the account holder and that Christopher Abend is the only person authorized to take withdrawals from the account.

## CONCLUSIONS OF LAW

## Background of Litigation

On November 30, 2015, Judge Edward J. Lodge, who was presiding at the time, granted Jacobs' motion for summary judgment, finding as a matter of law that Jacobs had a valid PACA Trust claim over Taylor Produce in the amount of $1,327,478.16.  *See*

*Order* (Dkt. No. 136).  Judge Lodge held, as a matter of law, that Jacobs complied with all the notice requirements of PACA.

On December 18, 2015, Judge Lodge issued an Order – pursuant to a stipulation – that Judgment be entered (1) for $4,620,167.96 to IPPC against Taylor Produce LLC; and (2) for $1,026,074.75 to Nonpareil Farms, Inc. against Taylor Produce LLC.  *See Order (Dkt. No. 143).*

Thereafter the case was transferred to this Court and a trial date was set for November 7, 2016.  Pursuant to a stipulation, the Court issued an Order that a Judgment be entered (1) for $363,225.15 in PACA claims of plaintiff GVO Farm Services, Inc. against Taylor Produce, LLC, and (2) for the $322,845.30 in PACA claims of VO Enterprises against Taylor Produce LLC.  *See Order (Dkt. No. 184).*

Prior to trial, Jacobs filed a motion to enter a final Judgment under Rule 54(b) against Taylor Produce declaring that Jacobs has a valid PACA Trust against Taylor Produce in the amount of $1,327,478.16.  The Court granted that motion and entered a Judgment against Taylor Produce LLC and Alan Taylor in the sum of $1,327,478.16 plus prejudgment interest.  *See Judgment (Dkt. No. 169).*

Jacobs' case against IPPC then proceeded to trial.  Jacobs claims that IPPC improperly deducted $1,327,478.16 prior to remitting the proceeds to Taylor Produce from the sale of Jacobs' potatoes.

## Governing Legal Standards

Congress enacted PACA with the aim of "preventing unfair business practices and promoting financial responsibility in the fresh fruit and produce industry."  *Sunkist*

*Growers, Inc. v. Fisher,* 104 F.3d 280, 282 (9th Cir.1997).  PACA was "designed in part to assure that farmers are paid for their produce."  *Perfectly Fresh Farms. Inc. v. United States Dep't of Agric.,* 692 F.3d 960, 962 (9th Cir.2012).  PACA provides protection to produce sellers by "impress[ing] a trust on the perishable agricultural commodities received by the purchaser, all inventories of food or other products derived therefrom, and receivables or proceeds from the same of such commodities and products."  *Middle Mountain Land & Produce Inc. v. Sound Commodities Inc.,* 307 F.3d 1220, 1223 (9th Cir.2002).

Under 7 U.S.C. § 499e(c)(2), a trust begins when the dealer receives perishable agricultural commodities and exists until all unpaid suppliers have been paid in full.  The PACA regulations defining "trust assets" re-enforce this interpretation by specifying that "[t]rust assets are to be preserved as a non-segregated 'floating' trust" and that "[c]ommingling of trust assets is contemplated."  7 C.F.R. § 46.46(b).  "The concept of a floating trust means that proceeds from prior produce sales can be used to pay suppliers in subsequent and unrelated transactions."  *Sol Group Marketing Co. v. Producers Choice, LLC,* 2013 WL 5502798 (C.D. Calif. Sept. 30, 2013).

PACA trust beneficiaries are not required to trace their trust assets – the burden is on the non-trust beneficiary to show that certain sums are not subject to the PACA trust.  *Nickey Gregory Co., LLC v. AgriCap, LLC,* 2011 WL 1793328 (N.D.Calif. May 11, 2011).  PACA trust beneficiaries "are granted statutory priority in repayment, even senior to secured creditors."  *Sysco Food Services of Seattle, Inc. v. Country Harvest Buffet Restaurants, Inc.,* 245 B.R. 650, 652 (9th Cir. BAP 2000).  Third-parties who collect or

otherwise receive PACA trust assets, including receivables or assets acquired with the proceeds from sales of produce, must disgorge those assets to the extent necessary to satisfy claims of PACA trust beneficiaries. *Endico Potatoes, Inc. v. CIT Group Factoring, Inc*., 67 F.3d 1063, 1069 (2nd Cir. 1995).

General principles of trust law govern the PACA trust, unless those principles directly conflict with PACA. *Boulder Fruit Exp. & Heger Organic Farm Sales v. Transp. Factoring, Inc.,* 251 F.3d 1268 (9th Cir. 2001). Any act or omission inconsistent with the duty owed to the PACA Trust Beneficiaries, including dissipation of trust assets, is unlawful and constitutes a "breach of trust". *See* Restatement (Second) of Trusts, §201; 7 C.F.R. §46.46(d)(1).

## Analysis

Based on the Findings of Fact set forth above, the Court concludes that all the proceeds from IPPC's sales of Taylor Produce's potatoes were PACA Trust Assets. 7 U.S.C. §499e(c)(2). Hence, IPPC's deduction of $1,327,478.16 constitutes a wrongful conversion of PACA assets unless that deduction was taken pursuant to PACA's statutory or regulatory provisions.

IPPC argues that the sum withheld was a "contemplated expense" that may be deducted pursuant to 7 C.F.R. § 46.46(e)(5). That provision is headed "Prompt payment and eligibility for trust benefits," and states as follows:

> The amount claimable against the trust by a beneficiary or grower will be the net amount due after allowable deductions of contemplated expenses or advances made in connection with the transaction by the commission merchant, dealer, or broker.

A "contemplated expense" refers to "an expense that is contemplated between the parties at the time the parties entered into a contract."  *In re Veg Liquidation, Inc.,* 516 B.R. 545 (W.D.Ark. 2014).  Here, there is no evidence that Jacobs and Taylor Produce contemplated that Taylor Produce would deduct anything for IPPC's expenses before remitting the sales proceeds to Jacobs.  As discussed in the Findings of Fact, the evidence conclusively shows that Jacobs and Taylor Produce contemplated that the only deduction would be for taxes.

Similar facts were faced by the Second Circuit in *R-Best Produce, Inc. v. Shulman-Rabin Marketing Corp,* 467 F.3d 238 (2nd Cir. 2006).  There, growers sold perishable produce to P.J. Produce for sale in New York City.  For several years, P.J. Produce paid Union Pacific Railroad Company to transport the produce from the growers to P.J. Produce's warehouse.  When P.J. Produce stopped paying bills, and was sued by the growers under PACA, Union Pacific sought to intervene, arguing that its transportation services added value to the PACA trust assets and were "contemplated expenses" under § 46.46.  The Second Circuit noted that in "some abstract sense" the growers and P. J. Produce certainly contemplated that the produce would need to be shipped to market, and that transport costs would be incurred.  *Id.* at 243.  But to be consistent with PACA's policy protecting growers, the Circuit interpreted the term "contemplated expenses" to apply only to "transactions between buyers and sellers of produce."  *Id.* at 243.  There was apparently no evidence that the growers and P.J. Produce contemplated deductions from the PACA trust for Union Pacific's billings – at least none was discussed.  *See also, Pacific Intern. Marketing Inc. v. A& B Produce, Inc.,*

**Findings of Fact & Conclusions of Law – Page 11**

462 F.3d 279, 287 (3rd Cir. 2006) (holding that in passing PACA, "Congress intended to protect sellers and suppliers of produce, not third-party service providers whose services are ancillary to the sale of produce").

Similarly, there is no evidence in this case that Jacobs and Taylor Produce contemplated that Taylor Produce would deduct IPPC's expenses before remitting sales proceeds to Jacobs – the only deduction contemplated was for taxes.  Moreover, IPPC has not established that the various expenses it seeks to recoup can be traced to Jacob's potatoes.  Finally, IPPC has not shown that its expenses for freight, Outside Brokerage Fees, and packaging materials were even authorized under the terms of its Marketing Agreement with Taylor Produce.

The Court therefore rejects IPPC's argument that its deduction of $1,327,478.16 was authorized by § 46.46(e)(5).  Packers' deduction of its expenses from the PACA trust assets allowed it to obtain payment for non-PACA trust claims before payment of valid PACA trust claims, in violation of 7 U.S.C. §499e(c)(2).

Under Idaho law, conversion is a "distinct act of dominion wrongfully asserted over another's personal property in denial of or inconsistent with rights therein." *Hunt v. Team Performance, Inc*., 2009 WL 2044682, at *6 (D. Idaho July 8, 2009); *Peasley Transfer & Storage Co. v. Smith*, 979 P.2d 605, 616 (Id.Sup.Ct. 1999).  IPPC is in possession of, and withholding, PACA trust assets that rightfully belong to Jacobs.[2]

---

[2] Two other growers, GVO and VOE, also sued the Nonpareil Defendants and Taylor Produce. They eventually obtained a Judgment against Taylor Produce, but dismissed their claims against the Nonpareil Defendants and did not participate in this trial.  Consequently, GVO and VOE are foreclosed from sharing in the recovery of trust assets from the Nonpareil Defendants.

Therefore, those sums, including the $114,798.92 on deposit at Zions Bank, must be disgorged to Jacobs.

## Alter Ego Claims

Generally, Idaho courts recognize two elements "that warrant casting aside the legal fiction of distinct corporate existence—first, there must be such a 'unity of interest' between the two at-issue corporations such that the separate personalities do not exist; and, second, the observance of the fiction or separate existence would, under the circumstances, sanction a fraud or promote injustice." *Gen. Conference of the Evangelical Methodist Church v. Crossing Church, Inc*., 2013 WL 2422748, at *3 (D. Idaho June 3, 2013). Here, the Nonpareil Defendants all share the same corporate address, the same registered agent, the same corporate President, the same corporate Director, Randi Phillips; the same Controller and CFO, Katseanes; and, the same corporate Secretary, Eileen Abend, who is since deceased. The testimony established that the companies are operated as "family business" and that decisions are made in furtherance of the interests of the group of companies, rather than one individual entity. To treat them separately would be to promote an injustice.

The Court therefore finds that the Nonpareil Defendants are alter egos of each other and that they are liable, jointly and severally, for the unpaid PACA trust claims of Jacobs.

## Conclusion

The Court therefore finds that Jacobs is entitled to a Judgment in the sum of $1,327,478.16 against Idaho Potato Packers Corporation, Nonpareil Corporation,

Nonpareil Farms, Inc., Nonpareil Processing Corporation, and Nonpareil Dehydrated Potatoes, Inc., jointly and severally.  This Judgment shall be entered pursuant to the Perishable Agricultural Commodities Act.

The Court will also enter a final judgment including the other sums previously awarded in various Orders that all contemplated that a final Judgment be entered.  The Court will enter that Judgment as a separate document pursuant to Rule 58(a).

DATED: December 15, 2016

B. Lynn Winmill
Chief Judge
United States District Court